F. Kiech Manufacturing Company v. Hopkins.

Opinion delivered June 16, 1913.

1.  MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.—When plaintiff was killed in a stave mill by being struck on the head by a bolt being thrown after coming in contact with the saw, the evidence *held* sufficient to support a verdict against the defendant.  (Page 589.)

2.  APPEAL AND ERROR—VERDICT—REVIEW.—Where a verdict is based upon the testimony of the witnesses for appellee, rather than those for appellant, the verdict will not be disturbed on appeal, although it may seem to the Supreme Court to be against the decided preponderence of the evidence.  (Page 591.)

3.  EVIDENCE—OPINION OF WITNESS—EXPERT WITNESS.—The opinion of a witness that various imprints made on a bolt in a stave mill looked as though they were made by the same instruments, was properly admitted in evidence when the witness was shown to possess knowledge and had such familiarity with the machinery of the stave mill as to render him an expert.  (Page 591.)

4.  MASTER AND SERVANT—INJURY TO SERVANT—"DUE CARE."—In an action for unlawful killing of a servant, on the question of the exercise by deceased of due care, the court charged the jury, "By due care is meant that degree of care which a person of ordinary prudence and intelligence would ordinarily exercise under similar conditions." *Held*, the instruction was correct, as simply defining the term "due care," so that the jury might have a proper conception of what was required of the deceased servant.  (Page 592.)

5.  MASTER AND SERVANT—DEATH OF SERVANT—NEGLIGENCE—INSTRUC-
    TIONS.—In an action against a master for the wrongful killing
    of a servant, an instruction was requested by defendant as fol-
    lows: "An employee in the exercise of his duties in connection
    with other fellow-servants, will not render the principal liable
    for an injury resulting to another employee, unless it is apparent
    to the servant in exercising his duty that his fellow servant is
    in danger, or that the performance of an act in a certain way
    will probably result in an injury to him, and that he must be
    aware of the fact at the time, or a person of ordinary prudence
    should be aware of the fact that an injury would result to his
    fellow-servant," held, properly refused. (Page 593.)

6.  TRIAL—ARGUMENT OF COUNSEL—CONDUCT OF TRIAL COURT—EXCEP-
    TIONS—DUTY OF COUNSEL.—While it is the duty of the court to
    correct the prejudicial effect of improper argument of counsel,
    it is also the duty of the party aggrieved to except to the failure
    of the court to remove the prejudicial effect of the improper
    argument. (Page 594.)

7.  TRIAL—ARGUMENT OF COUNSEL—DUTY TO EXCEPT.—Where a party
    fails to except to the action of the court in failing to remove the
    prejudice of improper remarks of counsel, he will be deemed to
    have waived the error. (Page 594.)

Appeal from Craighead Circuit Court, Jonesboro
District; *Frank G. Smith*, Judge; affirmed.

STATEMENT BY THE COURT.

On the 19th day of September, 1911, James A. Hop-
kins was in the employ of appellant, as carriage rider,
at its stave mill in Craighead County, Arkansas.  He
was killed while in the discharge of his duty, and the
appellee, his administratrix, instituted this suit against
appellant for damages, alleging among other things:

That it was the duty of Hopkins to place stave bolts
upon the carriage and firmly secure the same thereon,
and that it was the duty of another employee, the saw-
yer, to operate a lever, by the operation of which, the
carriage upon which Hopkins was performing his duties,
would move forward and backward.  When the carriage
was moved forward, the bolt would come in contact with
the saw and be sawed in two pieces and after the car-
riage passed the saw it was the duty of the sawyer to
stop the carriage and keep it stationary, until another
employee removed the parts of the bolts; that on the

occasion of the injury to Hopkins the sawyer stopped the carriage after it passed the saw, but instead of permitting it to remain still until the other employee had removed the bolt and while the bolt was upon the carriage, the sawyer carelessly moved the lever, so as to cause the carriage to run backwards; that thereby the bolt was again brought in contact with the saw, which was running at great speed; that the saw threw the bolt with great force against Hopkins, killing him.

The appellant answered, admitting that it was the duty of Hopkins to place the bolts upon the carriage and to firmly secure and fasten them with dogs, and alleged that it was his further duty to turn a ratchet wheel to move the bolt in front of a circular saw. It alleged that on the occasion when Hopkins was killed the bolt had been sawed in two pieces and that Hopkins released the dogs and failed to turn the ratchet wheel so as to remove the bolt away from contact with the saw, and thereby the bolt dropped in between the carriage and saw and against the saw, and that the speed with which the saw was running caused the bolt to fly back and strike the deceased, resulting in the injury complained of.

The answer denied the allegation of negligence set up in the complaint, and alleged that the death of Hopkins resulted from his own negligence. There was exhibited in the evidence a model purporting to show the machinery about which Hopkins was working when he was injured. The stave bolt that was being sawed at the time was also in evidence. The bolt was about thirty-two (32) inches long. The saw was about sixty inches in diameter. It was provided with a divider at the heel or the rear end, six (6) inches wide, thirteen (13) or fourteen (14) inches high, one-quarter ($\frac{1}{4}$) of an inch thick and about one and three-quarters ($1\frac{3}{4}$) inches from the heel of the saw.

Appellant contended, and introduced proof, tending to show that Hopkins failed to securely fasten the dogs and after the bolt had struck the saw and had sawed a kerf of a few inches, the sawyer discovered that the bolt was not securely fastened; that he then ran the carriage

back and changed the ends of the bolt; that Hopkins then again, by the use of the lever, automatically fastened the dogs into the bolt; that the sawyer then by the use of the lever, sawed the bolt in two; that before the front end of the bolt reached the rear end of the saw, Hopkins released the dogs from the bolt without removing the bolt back from the saw by the use of the ratchet wheel under his control, and that the saw thus came in contact with the bolt and the friction of the rapidly-revolving saw with the bolt threw it back against Hopkins, killing him. Several witnesses testified on behalf of appellant that the first dogging of the bolt was defective, and that after sawing the kerf in one end of the bolt, the defect was discovered and the carriage was run back and the bolt changed ends, when it was sawed through. Appellant contends that this testimony was undisputed and that it shows that the gash or kerf of a few inches in the bolt head was made by the front of the saw. One witness on behalf of the appellee testified, in part, as follows:

Q. After this bolt was dogged and run up to the saw, did anything occur—did they stop or back away from the saw or change ends with it, or anything of that kind?

A. No, sir; not that I saw.

This witness further testified:

"I was standing three or four feet from Mr. Sullivan (sawyer). I was helping because they were in a hurry and wanted to get certain work done before quitting time. I had no other duty to perform than to lay a block from the skidway over to the carriage. There was nothing to attract my attention or hinder me from seeing Sullivan change ends with the block if he had done it. I did not see him do it."

Appellant further contends that the physical facts show that the gash or saw kerf of a few inches in the head of the block must have been made by the front of the saw, and that an examination of this kerf shows that it was in a straight line, paralleling the surface of the

bolt. There was testimony tending to show that the saw was running at the rate of eight thousand, one hundred (8,100) feet per minute, and appellant contends that it would have been impossible for the heel of the saw, running at that rate of speed, to have cut a gash or kerf on a straight line, paralleling the surface of the bolt, and several witnesses testified on behalf of appellant to this effect. One witness stated that when the bolt was run back on the carriage it would strike the divider and either break it or throw the carriage off of the track. It could get in at the back end of the saw by getting almost across the saw kerf. Then the saw would throw the bolt up. It would not cut a saw kerf like the one in the bolt, but would tear off a corner of the bolt. Another witness said that the cut in the ragged end of the bolt could not have been made with the heel by it coming back toward it with the divider there. Nothing could have held it down to the saw to make that kerf and then it could not have been parallel with the length of the bolt as it is. If it came back in the back end of the saw, the kerf would have been reversed. The kerf could not have been made on the line like it is. It would not have been parallel and straight as this kerf is. One of these witnesses on cross examination stated that "he was at Nettleton when the court, jury and attorneys were there and the measurements were being made and the saw rig run. The same bolt was in evidence over there. While the saw was standing still he saw some one, in the presence of the jurors, take hold of the bolt and put it down into the carriage and shove the back end of it into the gash. The saw teeth came into the bottom. It came nearly across the carriage. It did not set up to the saw." Witness saw the experiment made. He was foreman at the mill.

The record shows that the jurors were permitted to saw off a portion of the ragged end of the bolt, revealing the marks of the saw on the saw kerf.

On behalf of the appellee, a witness testified that "he saw the bolt that struck Hopkins, when it went up to the saw. He saw the kerf after the saw went through

the bolt, cutting it into two pieces." He stated that "the bolt went past the saw that far" (indicating). Witness was asked what became of the bolt, and stated that "he saw the off-bearer reach for it, but did not know whether he took hold of it or not. He did not see the bolt when it came back and hit Mr. Hopkins." Witness said "he did not know how far the bolt went back." He said "it passed the saw or the divider. He did not know whether it was undogged or not. Didn't know whether it passed the divider or not."

On the other hand, a witness on behalf of the appellant, who was present, testified that "the injury resulted by reason of Hopkins releasing the bolt with his lever. It dropped down between the saw and flew back and hit him. The end of the bolt got within about eight inches of the rear end of the saw and it was undogged."

There was testimony on behalf of appellant to the effect that the bolt did not remain long enough after it dropped against the saw for the surface of the bolt to burn and become black.

A witness on behalf of the appellee, who thoroughly understood the method of operating the carriage and saw and who had worked at this plant at different times for more than nine years, testified that "the carriage should be run far enough to let the bolt go past the divider a few inches. Then the off-bearer takes it off the carriage. The ratchet man should release the dog when the off-bearer takes hold of the bolt. The carriage should be moved back a little—about four inches—as soon as the block is sawed to clear the divider. After the block is sawed the carriage is supposed to stop at the place for the off-bearer to take the block off. Then the sawyer runs the carriage back for another bolt. When the bolt is sawed and run past the divider and the ratchet man, using his lever, undertakes to release the bolt, it usually releases it at the same time at both ends. Sometimes there will be a sharp corner in the dog that will catch the bolt. It is not often that the teeth come out at one end and stay in at the other end, when the

ratchet man undertakes to release the bolt. It would happen at least once in a day. When the hind end of the bolt is released from the dogs and the front end remains fastened, if the carriage is rolled back it will put the hind end of the bolt diagonally across. If the bolt had been put on the carriage and it was not dogged right and they went to reset it, it would be proper for the block setter to turn the dogs loose and the head sawyer would roll it over a little bit." Witness had never seen any one change ends with the bolt. Witness saw two sets of dog marks in the ends of the bolt. The teeth in the plain or square end of the bolt looked to be the same to witness—the same distance apart between them. At the other end—the ragged end—the dog marks were about a half inch apart. This witness further testified that "if the bolt was sawed in two and the carriage was run back so that the bolt stopped along even with the saw, and if the saw was running against it with any pressure, that it would leave a black place on the surface of the bolt. If it stayed there long enough, it would heat the saw in a very short time. If a bolt had run through the saw and over at the proper place to take the bolt off of the carriage, there would be no way for the bolt to come in contact with the saw, without the movement of the lever used by the head sawyer." Witness further testified that "the machine was a little tricky. They had to watch it to keep it from running away. It was easy on the lever and the lever would fall over and throw the friction together if the sawyer was not very watchful of it."

Another witness testified that "he saw a bolt fall over the table on the right-hand side. If the bolt were on the back side, it would remain until another block pushed it off; if on the front side, it would be removed. There was no pressure between the outer edge of the bolt and the saw."

One of the witnesses on behalf of the appellee, who had worked at the machine a little over nine years, was given the bolt in the presence of the jury and asked to

examine the saw marks in the gash or kerf in the ragged end and to say whether or not they were such that the saw teeth from the back side of the saw could have made. Witness, over the objection of appellant, answered that he believed that could have been done.

There was testimony on behalf of the appellee tending to impeach the witnesses who testified on behalf of the appellant, as to the manner in which the injury was produced, by showing that these witnesses had made contradictory statements.

Among other instructions, the court gave the following, numbered "7:"

"By due care is meant that degree of care which a person of ordinary prudence and intelligence would ordinarily exercise under similar conditions."

Appellant objected to the giving of the instruction and asked the court to modify same as follows:

"An employee in the exercise of his duties, in connection with other fellow-servants, will not render the principal liable for an injury resulting to another employee, unless it is apparent to the servant in exercising his duty that his fellow-servant is in danger or that the performance of an act in a certain way will probably result in an injury to him, and that he must be aware of the fact at the time, or a person of ordinary prudence should be aware of the fact that an injury would result to his fellow-servant."

The court refused to make the modification and the appellant duly excepted to the ruling of the court in giving the instruction and in refusing to modify the same as requested.

In his closing argument to the jury, counsel for the appellee used the following language:

"Gentlemen: Do you know how fast this wheel is running? They tell us that it was going 450 revolutions per minute. That means the outer edge of this saw was going 8,100 feet per minute or more than one and one-half (1½) miles per minute or more than ninety-two (92) miles per hour or more than two thousand, two hun-

dred (2,200) miles per day. We could eat breakfast in Jonesboro Monday morning, go around the earth at that rate of speed and be back to dinner in Hatchie Coon, Thursday noon. At that rate of speed, if this gang of witnesses would leave this earth Monday morning about 4 o'clock they would land in hell Wednesday before sunup.''

Upon objection being made to the argument by counsel for appellant, counsel for appellee stated that ''he would take it back,'' and the court told the jury that the argument was improper. There were no exceptions to the ruling of the court.

Counsel for the appellee, in his closing argument, further stated to the jury as follows:

''Mr. Ellis is an old man. I am not going to criticise him; but when I refrain from doing so, I am showing him much more consideration and mercy than did the men who corrupted him and brought him here to pollute this court's fountain of justice.''

Counsel objected to the argument, on the ground that it was improper and the court made no ruling. No exceptions were saved for the failure of the court to make a ruling upon this argument.

From a judgment in favor of the appellee, this appeal has been duly prosecuted.

*Hawthorne & Hawthorne,* for appellant.

1. The finding of a jury is conclusive only where there is legally sufficient evidence to support it; but where the verdict is based upon evidence which is irrational, and contrary alike to known physical facts and human knowledge and experience, it will not be sustained. 79 Ark. 606; 119 S. W. 328; 60 Pac. 907; 96 S. W. 1045; 24 So. 771; 52 N. W. 119; 84 N. W. 36; 33 S. W. 428; 86 N. W. 178; 71 N. W. 434; 124 Ill. App. 89; 22 Fed. 905, 910.

2. The opinion evidence of witnesses Cochran and Hopkins was an invasion of the province of the jury, was incompetent and prejudicial. 97 Ark. 180; 85 Ark. 496; 82 Ark. 215; 78 Ark. 55; 56 Ark. 612; 65 Ark. 98; 62 Ark. 70; 36 Ia. 472; 41 S. W. 445; 92 Mo. App. 221.

3. The seventh instruction should have been modified as requested by appellant. 147 S. W. 86.

4. The cause should be reversed for prejudicial language of plaintiff's counsel in his closing argument. The court failed to rule on appellant's objections, and failed to admonish the jury that it was improper. 65 Ark. 635; 61 Ark. 136; 95 Ark. 233; 87 Ark. 461; 89 Ark. 58; 81 Ark. 31; 71 Ark. 415; 75 Ark. 577.

*Lamb & Caraway,* for appellee.

1. The evidence sustains the verdict.

2. There was no error in admitting any of the testimony given by Cochrane or Hopkins. 95 Ark. 284, 290; 87 Ark. 443; 77 Ark. 434, 436; 104 S. W. 77, 84; 147 S. W. 852, 857; 84 N. W. 657, 658; 94 Fed. 329, 331; 68 N. W. 605, 68 Fed. 1, 5; 107 S. W. 374, 378; 61 N. W. 912,; 81 N. W. 518, 520.

3. There was nothing prejudicial in the argument of counsel. 74 Ark. 256; 98 Ark. 83, 85; 96 Ark. 87, 92; 90 Ark. 398, 406; 91 Ark. 93; *Id.* 576; 100 Ark. 107, 121; *Id.* 218, 225; *Id.* 232, 238; 73 N. E. 780, 786.

4. The court was right in refusing to modify instruction 7. The instruction as given merely defined "due care" referred to in instruction 6. The doctrine of discovered peril invoked by the proposed modification had no application. Acts 1907, page 162.

WOOD, J., (after stating the facts). On examination of the bolt and the model of the machinery about which Hopkins was working when he was killed, we are convinced that the saw kerf in the ragged end of the bolt was made by the front end of the saw, as contended by appellant, and as stated by the witnesses who testified affirmatively to that fact. The kerf shows that it was on a parallel line with the length of the bolt and the marks of the saw teeth as revealed on the inside of the kerf, so far as they are distinctly visible, show conclusively to our minds that it would have been impossible for the kerf to have been made by the heel of the saw. These saw teeth marks, a few inches on the inside of the saw kerf, indicate unmistakably the direction in

which the saw was moving, and they show that the bolt must have approached it from the front end of the saw. If the bolt had approached the heel of the saw, as contended by appellee, the marks of the saw teeth must have been in the opposite direction from what they appear to be. And the kerf, had the bolt approached the heel of the saw, could not have been straight and on a parallel line with the length of the bolt and could not have cut as far into the end of the bolt as the saw kerf shows. Witnesses testify that the bolt would have been thrown up and away from the saw and that there could not have been force enough to have held it to the heel of the saw, in order to have made the kerf as it appears. Witnesses testify that if the rear dog was released and the rear end of the bolt dropped down and brought back against the saw moving in the direction in which it was going, and with the rapidity it was moving, it would have been impossible to have made the kerf on a line straight or parallel with the length of the bolt. This accords with our view of the physical facts, as shown by the appearance of the kerf in the bolt and the manner of operating the machinery, as testified to by the witnesses and shown by the models as exhibited in the evidence and brought into this record and used in the oral argument.

So, if the liability of the appellant depended upon whether or not the kerf in the bolt was made by the front or the heel of the saw, we would sustain the contention of the appellant on that point, notwithstanding the testimony of the appellee tending to show that the sawyer did not change the ends of the bolt, and notwithstanding the testimony of a witness to the effect that he thought it could have been done in the manner urged by the counsel for the appellee, and notwithstanding the jurors visited the mill plant and viewed the saw slipped into the kerf on the bolt from the heel of the saw. If recovery depended on whether the kerf was made by the front or the heel of the saw, then all of this testimony would come within the rule of *Waters-Pierce Oil Company* v. *Knisel,* 79 Ark. 608, and other cases cited and

relied on in appellant's brief. But because the kerf was not cut by the heel of the saw, it by no means follows that the undisputed evidence and the physical facts show that Hopkins' death was caused in the manner contended for by the learned counsel of appellant.

The complaint alleges that while the bolt was upon the carriage the sawyer carelessly moved the lever, so as to cause the carriage to run backward and thereby brought the bolt again in contact with the saw, which was running at a great speed, and threw same with great force against appellee's intestate.

The evidence is set forth somewhat at length in the statement and there is some testimony to warrant the jury in finding that the death of Hopkins was caused in the manner alleged in the complaint. It was shown that there was a defect in the lever of the carriage and that unless the sawyer was careful in handling it, the carriage would run away. There is no dispute that Hopkins was killed by the bolt striking him on the head. There was testimony to warrant the jury in finding that the bolt passed through the saw. One witness testified positively to this effect. It was within the province of the jury to believe this testimony, although the decided preponderance of the evidence may show to the contrary. If the bolt passed the heel of the saw, the only possible way in which the death of Hopkins could have resulted under the evidence, was as alleged in the complaint. That it did so result is not contrary to the physical facts. Although the kerf in the bolt was made by the front of the saw, and although the sawyer after this changed the ends of the bolt and passed the bolt through the saw with the smooth end in front, still if he carelessly caused the carriage to move back, after the block had passed through, but before it was entirely released from the dogs, causing the rear end of the bolt to move toward the saw, the bolt might have been caught by the saw teeth in the edge of the kerf and in the splintered and jagged end thereof and been hurled against Hopkins.

On examination, after sawing off the end of the block

and exposing the inside of the kerf to view, the jury might have come to the conclusion that the saw teeth caught between the edges of the kerf at the splintered and ragged end of the block and were thereby fastened long enough to throw the block over against Hopkins. While the upper end of the kerf is comparatively smooth and shows plainly the saw teeth and the direction in which the saw was moving when the imprint of the saw teeth was made, the lower end of the kerf or that next to the carriage, was more or less frazzled, with the fibers of the wood broken down on the inside of the kerf, and there are indentations or marks on the inside of this kerf, indicating where the saw teeth had been and showing by the splintered condition of the sides of the kerf, that the saw teeth might have fastened in the wood. After sawing off the piece of the end showing the inside of the kerf, the jury concluded that the testimony showing that the bolt passed the heel of the saw, was true and that the carriage was moved back by the sawyer and the bolt thus brought in contact with the heel of the saw, fastening the teeth of same in the kerf of the ragged end of the bolt and hurling it over against Hopkins, according to the theory of the appellee. We are of the opinion that this explanation and theory as to how the injury was produced, is not contrary to the physical facts. The witness who testified that the bolt went past the saw also testified that he saw the off-bearer reach for it but did not know whether he took hold of it or not. This testimony was believed by the jury and it tended to show that the bolt did pass the end of the saw, for it would be unreasonable to conclude that the off-bearer would reach for the bolt before the same had passed the saw. Especially would it be foolhardy for him to have exposed himself to the danger of doing so, if the front end of the bolt was still some eight inches from the rear end of the saw, as one of the witnesses for the appellant testified it was.

The theory of appellant was, that after the saw passed through the bolt, but before the front end of it

reached the rear end of the saw, Hopkins released the dog without moving the bolt back from the saw by the use of the ratchet wheel, and that the saw thus came in contact with the bolt, and the friction thereby created threw the bolt over against Hopkins. But the testimony of the witness on behalf of the appellee, showing that the entire bolt passed through the saw and that the rear end of the bolt passed the heel of the saw, and tending to show that the off-bearer reached for the bolt, is in direct conflict with appellant's theory and contention.

It was wholly within the province of the jury to believe and accept the testimony of the witness for the appellee and to disbelieve and reject the testimony of the witnesses for the appellant, and we will not disturb their verdict, although it may seem to us to be contrary to the decided preponderance of the evidence. See *St. Louis & S. F. Rd. Co.* v. *Kilpatrick,* 67 Ark. 47.

Second. The appellant objected to the testimony of certain witnesses on the ground that it was opinion evidence and that the testimony was not competent. Several of the witnesses for the appellant had testified that the sawyer changed the ends of the bolt, which injured the appellee's intestate. One witness on behalf of appellee was permitted to testify, over the objection of appellant, that he had never changed the ends of a bolt. Witnesses further testified on behalf of the appellee to the effect that they had examined the bolt and that the imprint of the dog teeth on the plain or square end of the bolt looked to be the same, and there were other expressions of opinion of certain witnesses on some phases of the case to which objection was made. We have examined these and are of the opinion that there was no prejudicial error in the ruling of the court in permitting this testimony and in not excluding the same from the jury. It was shown from the length of time the witnesses had been employed by mill plants of the kind under consideration and their familiarity with such machinery, that they were experts. Their opinion related to the subject-matter with which the jury were not sup-

posed to be so familiar as they. The testimony, there-
fore, was competent. *Dardanelle, P. B. & T. Co.* v.
*Croom,* 95 Ark. 284-290. See also *Kansas City So. Ry.
Co.* v. *Henrie,* 87 Ark. 443; *St. Louis, I. M. & S. Ry. Co.*
v. *Dawson,* 77 Ark. 434.

Third. The court did not err in refusing to modify
instruction No. 7. That instruction was but a continu-
ation of instruction No. 6, which was as follows:

"If you find from the preponderance of the evidence
that Sullivan, the sawyer, at the carriage where deceased
worked, was negligent, as that term has been defined, in
the performance of any duty which he owed to deceased,
and that the injuries sustained by deceased resulted from
such negligence on the part of Sullivan, and that at the
time of being injured, deceased was in the exercise of
due care for his own safety, your verdict will be for the
plaintiff."

The court had also used the term in the first instruc-
tion in connection with the duty of the deceased, to exer-
cise "due care" for his own safety. The effect of in-
struction No. 6 was to tell the jury that, even though
the sawyer was negligent and that such negligence re-
sulted in the death of Hopkins, still appellee could not
recover unless Hopkins was in the exercise of "due care"
for his own safety. Having used the term "due care"
in connection with the duties of Hopkins in the sixth
instruction, the court in its instruction No. 7 was simply
defining what the term "due care" meant, so that the
jury might have a proper conception of what was re-
quired of Hopkins, as a condition precedent to the recov-
ery by the appellee. The term was not used in defining
the duty of the sawyer, the employee of appellant, whose
negligence was alleged to have been the cause of the
injury. The court had correctly defined "negligence"
in other instructions. It will therefore be seen at a
glance that the modification was not at all germane to
the subject-matter of the instruction which the appellant
requested to be modified. As a modification to instruc-
tion No. 7 it was entirely a misfit and the court did not
err in refusing it because of that fact.

A modification to an instruction should pertain to the subject-matter which the instruction itself contains. If the appellant desired such an instruction it should have presented it as a separate and independent prayer or in connection with some prayer in which the court was defining the duty of the employee, whose negligence was alleged to have caused the injury complained of. But the requested modification, even if presented as an independent prayer for instruction, was not the law and therefore the court did not err in refusing it. It was not necessary in order to make the company liable that Sullivan, the sawyer, should actually know that his fellow-servant, Hopkins, was in danger. It was sufficient, if the sawyer, in the exercise of ordinary care in the performance of his duties as an employee, could or should have known that his act in reversing the carriage might result in the injury to his fellow-servant. A corporation can only act through its servants and agents, and those through whom it acts must exercise ordinary care in the discharge of their duties, to avoid an injury to fellow-servants, that by the exercise of such care, could and should have been reasonably anticipated and avoided. The effect of the requested modification was to tell the jury that appellant was not liable unless Sullivan had discovered the peril of Hopkins before running the saw carriage containing the bolt back to the saw. If this were the law, the master would not be liable for an injury to his servant unless such injury was caused by the wilful or gross negligence of the employee causing the injury. Sullivan being in control of the movements of the carriage and knowing the positions of the respective fellow-employees working with him and the consequences likely to result to them from his failure to exercise ordinary care in the performance of his own duties, would render his master liable for an injury resulting to a fellow-employee by reason of such failure. Act 69, Acts of Ark. 1907, p. 163; see *Aluminum Co.* v. *Ramsey*, 89 Ark. 522.

Fourth. The record presents no question for review concerning the alleged improper remarks of counsel. If the remarks of counsel were improper, they were not, to say the least, so flagrant as to be prejudicial at all events. While it is the duty of the court on its own motion to make such rulings as may be necessary to correct the prejudicial effect óf any improper argument (*Vaughn* v. *State*, 58 Ark. 353), it is also the duty of the party affected by any improper argument to except to the failure of the court to take the necessary steps to remove any prejudicial effect of such argument. Unless the party affected excepts to the failure on the part of the court to remove, or to attempt to remove, the prejudice of the improper argument, he will be deemed to have waived any error predicated thereon. *Meisenheimer* v. *State*, 73 Ark. 407; *Southwestern Tel. & Tel. Co.* v. *Abeles,* 94 Ark. 254.

Affirmed.

SMITH, J., disqualified and not participating.